**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CENTIMARK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| TROY OSBORNE, PHILLIP HAMMETT, | ) | |
| MICHAEL CALVIN, AND BLUSKY | ) | |
| RESTORATION CONTRACTORS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**COMPLAINT**</u>

Plaintiff CentiMark Corporation ("CentiMark") files this Complaint against Troy Osborne ("Osborne"), Phillip Hammett ("Hammett") and Michael Calvin ("Calvin") (collectively, "Individual Defendants"), and BluSky Restoration Contractors, LLC ("BluSky"), and in support states as follows:

<u>**NATURE OF ACTION**</u>

1.      The Individual Defendants are former employees of CentiMark.  After working for CentiMark, each began employment with BluSky, a competitor of CentiMark.

2.      This action involves:

a.      Osborne's improper access of his protected, CentiMark-issued laptop computer to obtain CentiMark's confidential and proprietary information, including trade secrets, in restricted files so that he and BluSky could use that information to compete unfairly against CentiMark;

b.      Osborne's and BluSky's misappropriation of CentiMark's trade secrets;

c.      Osborne's breach of his duty of loyalty to CentiMark;

d.      the Individual Defendants' breaches of their Employment Agreements with CentiMark;

e.      unfair competition by all of the Defendants against CentiMark;

f.      tortious interference by BluSky, Hammett and Calvin with CentiMark's contractual relationships; and

g.      conspiracy by all of the Defendants to injure CentiMark's business and employee relationships.

3.      By this action, CentiMark seeks to obtain the return and assure the non-use of its confidential and proprietary information, including trade secrets, and to recover damages suffered as a result of Defendants' unlawful conduct.

## PARTIES

4.      CentiMark is a Pennsylvania corporation whose principal place of business is at 12 Grandview Circle, Canonsburg, Pennsylvania 15317.

5.      Defendant Osborne is an adult individual and resident of Ashville, Alabama, who worked for CentiMark from March 15, 2016 until April 30, 2018, when he submitted his resignation.  He went to work for Defendant BluSky in May 2018.

6.      Defendant Hammett is an adult individual and resident of Olive Branch, Mississippi, who worked for CentiMark as a Sales Manager from October 1, 2014 through December 30, 2015.  He immediately thereafter went to work for Defendant BluSky.

7.      Defendant Calvin is an adult individual and resident of Memphis, Tennessee, who worked for CentiMark as a Technical Representative from March 1, 2012 through January 2, 2016.  He then went to work for Defendant BluSky.

8.      Defendant BluSky is a Delaware limited liability company with a principal place of business in Centennial, Colorado.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over the claims arising under the federal Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.,* and the federal Computer Fraud and Abuse Act, 18 U.S.C § 1030, pursuant to 28 U.S.C. § 1331.

10.     This Court has supplemental jurisdiction over all other claims alleged in this Complaint pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims under federal law that they form part of the same case or controversy.

11.     Alternatively, this Court also has jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1332(a) because CentiMark and each Defendant are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

12.     This Court has personal jurisdiction over the Individual Defendants because each of them in his Employment Agreement with CentiMark expressly consented to the personal and exclusive jurisdiction of this Court as a condition of their employment.  True and correct copies of the Employment Agreement of each of the Individual Defendants with CentiMark are attached as Exhibits A-C.

13.     This Court may obtain personal jurisdiction over BluSky because BluSky has the required minimum contacts with this forum. BluSky has registered to do business in Pennsylvania and, upon information and belief, solicits roofing work throughout Pennsylvania and performs work in the Western District of Pennsylvania.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action took place in this judicial district and a substantial part of the property that is subject of this action is in this judicial district.  Specifically, Osborne's CentiMark-issued laptop was configured in and issued to him from CentiMark's headquarters in Pittsburgh, as was his mobile phone.  Those items are currently in CentiMark's possession in Pittsburgh.  The forensic examination of his computer was performed in Pittsburgh.  Also, servers housing much of CentiMark's confidential, proprietary information and trade secrets are located at its headquarters in Pittsburgh.  Moreover, much of CentiMark's confidential, proprietary information and trade secrets were developed at its headquarters in Pittsburgh.  While employed by CentiMark, Osborne's internet connections from any CentiMark field office or from his laptop in any non-office location via VPN came through CentiMark's servers in Pittsburgh.  The harm from Osborne's and BluSky's misappropriation occurs in Pittsburgh, where CentiMark's headquarters is located.

15.     Also, each of the Individual Defendants agreed in his Employment Agreement that this judicial district has exclusive jurisdiction over any action or proceeding arising out of or relating to his Employment Agreement, and waived any objection to venue.  *See* Exhibits A-C.

## FACTUAL BACKGROUND

### CentiMark's Business

16.     CentiMark was founded in 1968 in Pittsburgh and has since grown to become a leader in the commercial roofing industry in North America.

17.     Through 85 offices in the United States, Canada and Mexico, CentiMark markets and sells, installs and services major roofing and flooring systems for commercial and industrial customers.

18.    Because the commercial roofing and flooring industry is highly competitive, CentiMark has recognized that, in addition to providing the highest standards of service and safety, it must also cultivate strong customer relationships through its sales efforts.

19.    CentiMark invests time, effort and resources in cultivating those relationships.

20.    CentiMark's sales efforts and relationship development are primarily carried out by a dedicated sales force, comprised of individual salespeople assigned to specific territories or accounts.

21.    That sales force is supported by employees tasked with researching, analyzing and compiling information about customers, jobs performed for customers and job costs and profit margins, and potential customer locations, facilities and roofing requirements.

22.    CentiMark's customer relationships are built over time through regular and recurring interactions of its salespeople with customers.

23.    CentiMark's commitment to quality service and customer care has resulted in it having substantial goodwill with its clients.

24.    So that they will succeed, CentiMark entrusts its sales personnel with its confidential and proprietary information, and trade secrets, including:

a.    technical information such as installation methods, compositions, and product developments and improvements;

b.    business information such as customer sales and job information, job cost, pricing and profit margin, information customer warranty information, sales proposals, leads, methods and approaches, lists of customers and prospective customers, and information concerning their facilities, roofing requirements and needs, identity of and information about key contact personnel of customers and prospective customers, service

reports, supply sources, and marketing, production and merchandising systems or plans; and

      c.    sales-related systems applications such as its auto-quote and auto-proposal systems ("Confidential Information").

25.    Much of the information identified in the preceding paragraph is in the nature of trade secrets because it has independent economic value by virtue of its not being generally known to and not being readily ascertainable by CentiMark's competitors, who could and would obtain value from such information.

26.    CentiMark has taken affirmative and reasonable steps to protect its Confidential Information.  It has limited access by password-protecting its computer applications and databases beyond requiring password protection for network access and by limiting access to Confidential Information based on the needs of each specific position.

27.    CentiMark also safeguards its Confidential Information through its Computer Systems Policy and by incorporating non-disclosure, non-solicitation and non-competition covenants in its Employment Agreements with employees.

**Individual Defendants' Employment Agreements with CentiMark**

28.    Each of the Individual Defendants was required, as a condition of and in consideration for their employment with CentiMark, to enter into an Employment Agreement.

29.    Osborne executed his Employment Agreement on February 26, 2016 and began his employment with CentiMark on March 15, 2016. (Ex. A).

30.    Hammett executed his Employment Agreement on September 30, 2014 and began his employment with CentiMark on October 1, 2014. (Ex. B).

31.     Calvin executed his Employment Agreement on February 27, 2012 and began his employment with CentiMark on March 1, 2012. (Ex. C).

32.     The Individual Defendants' Employment Agreements each identify the confidential and proprietary information and trade secrets of CentiMark, and define that information as CentiMark's Confidential Information. (Exs. A-C, Article III (a)-(d)).

33.     The Individual Defendants' Employment Agreements each contain the following Non-Disclosure of CentiMark's Confidential Information covenant:

> (a) Employee agrees to hold and safeguard all of CENTIMARK'S Confidential Information in trust and confidence for CENTIMARK. Employee agrees that Employee shall not, without prior written consent of CENTIMARK, misappropriate, disclose or use or make available to any person or any entity for use outside CENTIMARK's organization at any time, either during Employee's employment with CENTIMARK or subsequent to termination of such employment with CENTIMARK, for any reason, any of CENTIMARK's Confidential Information, whether or not it was developed by Employee. Employee agrees not to use said information to Employee's own advantage or to the advantage of others except as required in the performance of Employee's duties to CENTIMARK.

(Exs. A-C, Section 4.01(a)).

34.     The Individual Defendants' Employment Agreements each contain the following Return of Materials covenant:

> (b) Employee agrees that all records, drawings, blueprints, data, samples, models, correspondence, CENTIMARK's Confidential Information, manuals, notes, reports, notebooks, proposals and any other documents concerning CENTIMARK's customers or products or other technical information or business information used by CENTIMARK and any other tangible materials or copies or extracts of tangible materials regarding CENTIMARK's operations or business, testings, proposals, sales leads, pricing formulations or product development received by Employee during Employee's employment with CENTIMARK (hereinafter referred to as "CENTIMARK's Material") are and shall be the exclusive property of CENTIMARK. Employee agrees to keep

> CENTIMARK's MATERIAL at all times in CENTIMARK's custody and subject to CENTIMARK's control. Upon the termination of Employee's employment with CENTIMARK, for any reason, or upon demand by CENTIMARK, all CENTIMARK's Material shall be returned to CENTIMARK. No copies will be made by Employee, or retained by Employee, of any written information obtained, whether or not developed by Employee. Employee shall not alter or destroy any electronically stored information, but take steps to maintain its integrity for return to CENTIMARK.

(Exs. A-C, Section 4.01(b)).

35.     The Individual Defendants' Employment Agreements each contain the following

Restrictions on Competition covenant:

> Employee covenants and agrees that Employee shall not engage, directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder or otherwise, alone or in association with any other person, corporation or other entity, in any Competing Business in a Restricted Area during his employment and for two (2) years from the date of termination (regardless of the reason) of Employee's employment with CENTIMARK ("Restricted Period").

(Exs. A-C, Section 4.04).

36.     In Section 4.04(a) of the Individual Defendants' Employment Agreements, "Competing Business" is defined as "any person, business, enterprise or other entity which directly or indirectly sells or attempts to sell any products or services, or any combination thereof, which are the same as, or similar to, the products and/or services sold or offered by CENTIMARK at any time during the last three (3) years that Employee was employed by CENTIMARK."

37.     In Section 4.04(b) of the Individual Defendants' Employment Agreements, "Restricted Area" is defined as "that area comprised of all of the territory(ies), county(ies), district(s) or other geographical designations in which Employee has operated as an Employee of

CentiMark at any time during the two (2) year period just prior to Employee's termination."

38.     The Individual Defendants' Employment Agreements each contain the following

Non-Solicitation of Customers and Prospective Customers covenant:

> (a) Employee agrees that during his employment and for the two (2) year period immediately following his employment with CENTIMARK (regardless of the reason for termination), Employee will not, directly or indirectly, solicit the trade of, trade with, contact for business purposes or accept business from any Customer or Prospective Customer of CENTIMARK other than for the benefit of CENTIMARK. For the purposes of this Agreement, the term "Customer" shall mean any person or entity that has procured or agreed to procure CENTIMARK's products or services at any time during Employee's final three (3) years of employment with CENTIMARK and the term "Prospective Customer" shall mean any person or entity that has not yet become a Customer of CENTIMARK but has been contacted for the sake of doing business or solicited by CENTIMARK during Employee's final two (2) years of employment with CENTIMARK.

> (b) the prohibition on solicitation of Customers and Prospective Customers of CENTIMARK, as described in Paragraph 4.05(a), shall be limited to such acts which would constitute Employee's engaging in a Competing Business, as described in Paragraph 4.04(a); however, it shall not prohibit Employee, after termination of employment, from soliciting the trade of such Customers and Prospective Customers while engaged in, or for the promotion and purpose of, a business that is not a Competing Business.

(Exs. A-C, Section 4.05).

39.     The Individual Defendants' Employment Agreements each contain the following

Non-Solicitation of Employees covenant:

> Employee agrees that, during his employment with CENTIMARK and for two (2) years following termination of Employee's employment with CENTIMARK (regardless of the reason), Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any Employee of CENTIMARK to leave CENTIMARK for any reason whatsoever or hire or assist in the hiring of any Employee of CENTIMARK....

(Exs. A-C, Section 4.06).

40.     The Individual Defendants' Employment Agreements each contain the following

Notification of Subsequent Employment covenant:

> Employee shall upon termination of his employment with
> CENTIMARK, immediately notify CENTIMARK of the name,
> address and nature of the business of his new Employer, or, if self-
> employed, the name, address and nature of his new business or
> advise CENTIMARK of continued unemployment. Employee shall
> provide such notification immediately upon securing new
> employment, or commencing a business, and continue to provide
> such notification if such employment should change. Employee's
> obligation to provide such notice shall continue for two (2) years
> after the date of the Employee's termination of employment with
> CENTIMARK. Employee hereby agrees to disclose and authorize
> CENTIMARK to disclose this Agreement to Employee's new
> employer or prospective employer.

(Exs. A-C, Section 4.07).

41.     The Individual Defendants' Employment Agreements also provide that, if

CentiMark prevails in a proceeding for damages or injunctive relief in an action against an

Individual Defendant for breach of the Agreement, provision or covenant, the Individual

Defendant agrees CentiMark is entitled to reasonable attorneys' fees, costs and litigation

expenses incurred in securing relief.  (Exs. A-C, Section 5.03)

**CentiMark's Computer Systems Policy**

42.     CentiMark's Computer Systems policy governs use of the CentiMark Computer

System and by its terms its "Purpose" is to maintain the integrity and lawful orderly use of the

CentiMark Computer System.   A true and correct copy of the Computer Systems policy is

attached as Exhibit D.

43.     The Computer Systems policy applies to all CentiMark employees.  It defines the

CentiMark Computer System as  "all hardware and all software, whether owned and/or leased by

the company, and including any and all information contained therein, and specifically including

e-mail and all messages or images created therein." (Ex. D, Applicability and Definitions).

44.    The Computer Systems policy says with respect to ownership of CentiMark

information:

> Information in possession of current or former CentiMark
> employees, regardless of its origin, that relates to CentiMark, its
> suppliers, customers, employees or any other entity related to
> CentiMark shall be considered the sole property of CentiMark.
> This policy is in force regardless of the ownership status of the
> computer system that contains that information.

(Ex. D, Discussion/Policy Mechanics, Paragraph 2).

45.    The Computer Systems policy specifically directs against copying or otherwise

retaining CentiMark information for any use or purpose other than performance of job duties for

CentiMark, stating:

> It is the responsibility of every employee to safeguard the
> company, including its business, proprietary and confidential
> information. Therefore, no employee may copy, download, or in
> any other manner appropriate (whether in whole or in part) any of
> the data base(s), files, information, programming, software
> contained on any part of the CentiMark computer system for use in
> any manner not specifically related to the performance of
> employment duties for CentiMark. No employee may use or
> distribute software, information, file or database that is in violation
> of the license agreement for the hardware or software.

(Ex. D, Discussion/Policy Mechanics, Paragraph 9).

46.    As to return of information and files when CentiMark employment terminates, the

Computer Systems policy states:

> Every employee has an affirmative duty to return any and all files
> and/or information in his or her possession at the time of the
> termination of employment, regardless of whether the employee
> had permission to have the information in his or her possession.

(Ex. D, Discussion/Policy Mechanics, Paragraph 12).

47.     The Computer Systems policy also provides for dual password access to CentiMark's computer systems.  (Ex. D, Passwords)

48.     CentiMark's Computer Systems policy is in the CentiMark Policy Manual in each field office and is on CentiMark's intranet site (Centranet).

**Osborne's CentiMark Employment**

49.     Osborne was employed with CentiMark as a Regional Sales Manager from March 15, 2016 until December 31, 2016.

50.     As a Regional Sales Manager, Osborne's territory was Tennessee, Mississippi and Arkansas.

51.     As a Regional Sales Manager, Osborne was responsible for: managing and leading Sales and Service Sales Representatives; developing business plans and territory audits; ensuring his team provided sales and activity required to support the requirements of his region; reviewing sales tactics and strategies with his team to ensure growth in the market; working with telemarketing, national accounts and CentiMark resources to help generate opportunities for his team; accompanying Sales Representatives and doing call behinds to help develop team members' skills and complete deals; and working with the Regional Operations Manager to develop business plans for the Region.

52.     On January 1, 2017, Osborne was demoted to Senior Project Manager, which was his position until he resigned on April 30, 2018.

53.     As a Senior Project Manager, Osborne's sales territory was Alabama.

54.     As a Senior Project Manager, Osborne was responsible for managing all sales and marketing efforts in his sales territory, including without limitation maintaining and cultivating

existing business through managing and directing his territory's CentiMark Service Sales representatives, and generating new sales and service opportunities.

55.    As a Regional Sales Manager and Senior Project Manager, Osborne had access to CentiMark's Confidential Information, including but not limited to customer and customer job information, job cost, pricing and profit margin information, warranty information and service records, CentiMark sales force business plans, and CentiMark's auto-quote and auto-proposal systems.

**Individual Defendants' Violations of Their Employment Agreements with CentiMark**

56.    Upon information and belief, BluSky has hired and tries to hire current and former CentiMark employees, including the Individual Defendants, in an effort to unfairly compete against CentiMark.

57.    By going to work for BluSky, a direct competitor of CentiMark, within two years after their CentiMark employment ended and, upon information and belief, in the same geographic areas in which they worked for CentiMark, Hammett and Calvin each violated Section 4.04 of their Employment Agreement. (Exs. B-C, Section 4.04).

58.    By failing to notify CentiMark of their employment with BluSky within two years after their CentiMark employment ended, Hammett and Calvin each violated Section 4.07 of their Employment Agreement. (Exs. B-C, Section 4.07).

59.    After becoming employed by BluSky and before May 2017, Calvin also violated Section 4.05 of his Employment Agreement by submitting two proposals on behalf of BluSky to CentiMark's customers. (Ex. C, Section 4.05).

60.     In May 2017 CentiMark sent cease and desist letters to Hammett and Calvin regarding their violations of the non-compete, notification and non-solicitation covenants in their Employment Agreements.

61.     On August 1, 2017, Calvin declared, under penalty of perjury, that he had solicited work from two of CentiMark's customers, and acknowledged and reconfirmed his intention to comply with his obligations set forth in his Employment Agreement.

62.     In or around July 2017, while employed by CentiMark and without CentiMark's knowledge, Osborne began seeking employment opportunities outside of CentiMark.

63.     In the summer of 2017, Calvin began soliciting Osborne to leave CentiMark and work for BluSky.  Calvin then was employed as a Project Director by BluSky.

64.     Calvin was in contact with Osborne multiple times about Osborne meeting with Kelly Brown, Vice President of BluSky's Atlanta, Georgia office, concerning possible employment with BluSky.

65.     Upon information and belief, that meeting between Osborne and Brown took place on August 1, 2017.

66.     Upon information and belief, Calvin was involved in interviewing and hiring Osborne at BluSky.

67.     Hammett, then Vice President of Commercial Roofing for BluSky, also was involved in BluSky's hiring of Osborne.

68.     Upon information and belief, in or around November 2017, Hammett was in contact with Osborne through phone calls and text messages about coming to work for BluSky and solicited Osborne to do so.

69.     Hammett and Calvin's solicitations contributed to Osborne resigning from CentiMark to work for BluSky.

70.     Upon information and belief, BluSky either knew of and acquiesced in the solicitation of Osborne to resign from CentiMark and become employed by BluSky, or directed that action.

71.     Upon information and belief, BluSky has directed former CentiMark employees whom it now employs, including Hammett and Calvin, to solicit CentiMark employees to resign and become employed by BluSky.

72.     Hammett and Calvin's solicitations of Osborne were violations of Section 4.06 of their Employment Agreements. (Exs. B-C, Section 4.06).

73.     By going to work for BluSky, a direct competitor of CentiMark, within two years after his CentiMark employment ended and, upon information and belief, in the same geographic area in which he worked for CentiMark, Osborne violated Section 4.04 of his Employment Agreement. (Ex. A, Section 4.04).

74.     By failing to notify CentiMark of his employment with BluSky within two years after his CentiMark employment ended, Osborne violated Section 4.07 of his Employment Agreement. (Ex. A, Section 4.07).

**<u>Osborne's Unlawful Conduct and Misappropriation of CentiMark's Trade Secrets</u>**

75.     While employed by CentiMark and in the week before his notice of resignation on April 30, 2018, Osborne accessed CentiMark's Confidential Information and trade secrets on his CentiMark-issued laptop for his personal and/or for BluSky's benefit.

76.     On April 24, 2018, in the morning and afternoon, Osborne inserted two different USB devices into his CentiMark-issued laptop.

77.     On April 26, 2018, Osborne inserted a Seagate Free Agent USB device with a capacity of 500+ gigabytes into his CentiMark laptop.

78.     When Osborne provided notice of his resignation from CentiMark on April 30, 2018, he stopped coming to work, but did not return his computer and mobile phone.  CentiMark sent Osborne a letter on May 8, 2018, confirming his separation from employment on May 3, 2018 and reminding him of his obligation to return CentiMark property, including his computer, and of his obligations under his Employment Agreement with CentiMark.

79.     Osborne did not return phone calls from his superiors about return of his computer to CentiMark.

80.     In the morning of May 11, 2018, after his resignation, Osborne inserted another USB device into his CentiMark computer.  Later that day he returned his computer and mobile phone to CentiMark.  He did not return or provide any of these USB devices to CentiMark.

81.     As determined from a forensic analysis of Osborne's laptop after its return to CentiMark, a small sample of the information on the USB devices which Osborne inserted into his computer in the days just before and after he resigned from CentiMark includes: the 2017 business plan of a highly regarded CentiMark sales manager; Osborne's 2017 business plan with, *inter alia*, customer information and a list of active roof warranties of CentiMark customers in his sales territory; a list of CentiMark completed jobs with information on job size, labor hours and costs, material costs, and forecasted and actual profit margin; weekly job tracking spreadsheets; specific customer auto-quotes; project drawings; warranty anniversary reports; and specific customer auto-proposals.

82.     Upon information and belief, Osborne copied information like that described in the preceding paragraph, which constitutes CentiMark's Confidential Information and trade secrets, onto the USB devices he inserted into his CentiMark computer.

83.     Upon information and belief, Osborne also copied and retained CentiMark's Confidential Information using his personal email accounts and "Google Drive."

84.     Osborne's copying of CentiMark's Confidential Information violated of Section 4.01(b) of his Employment Agreement. (Ex. A, Section 4.01(b).

85.     All of the items identified in paragraph 81 constitute not just CentiMark's Confidential Information, but specifically constitute its trade secrets.  They are items in which CentiMark has invested and/or developed, which CentiMark safeguards, protects through passwords, limits access to and which have independent economic value by virtue of not being known to or ascertainable by others in CentiMark's business.

86.     Osborne was not authorized to access CentiMark's Confidential Information except to carry out his duties and responsibilities for CentiMark, and his access of CentiMark's Confidential Information for any other purpose other than to benefit CentiMark exceeded his authorization.

87.      Upon information and belief, Osborne electronically copied CentiMark's Confidential Information onto these USB devices for his and/or BluSky's benefit.

88.     No reason existed to copy or otherwise retain this kind of information on a USB device and/or on a "Google Drive" in order to carry out CentiMark job duties.

89.     Upon information and belief, Osborne took these steps of improperly acquiring and retaining CentiMark's Confidential Information and trade secrets on these USB devices to make himself a more attractive employment candidate to BluSky, and so that he and BluSky

could use CentiMark's Confidential Information and trade secrets to compete unfairly against CentiMark.

## COUNT I
### CentiMark v. Osborne and BluSky
### Violation of the Defend Trade Secrets Act

90.     CentiMark incorporates by reference Paragraphs 1-89 above as if fully set forth herein.

91.     While employed by CentiMark, Osborne had access to CentiMark's trade secrets.

92.     These trade secrets relate to CentiMark's products, services, customers and pricing.  They include but are not limited to (a) technical information about CentiMark's products, (b) business information, such as information about customer sales, warranties and facilities, sales methods and approaches, information about customers and prospective customers, their roofing requirements and needs, the identity of key personnel and contacts, as well as profit margin information, service reports, sales data, pricing information, and marketing, production and merchandising systems, and (c) sales-related software for sales quotes (auto-quote), proposals (auto-proposal) and pricing.

93.     These trade secrets relate to products and services used in and intended for use in interstate commerce.

94.     These trade secrets are of great economic value to CentiMark and not readily ascertainable outside of CentiMark by any proper means.

95.     CentiMark has spent significant resources in developing and maintaining these trade secrets, including employing teams of employees who analyze the markets and compile and organize data and information about potential customers, by internal analysis of customer

information and needs, and by developing systems for precise understanding of profit margins, quoting of prices and development of sales proposals.

96.    Disclosure and unauthorized use of CentiMark's trade secrets undermines CentiMark's competitive position in the market.

97.    CentiMark has made reasonable efforts to protect its trade secrets by limiting access to them, protecting them through restrictive covenants in Employment Agreements and implementing policies and other protections.

98.    Osborne knew or should have known that without CentiMark's consent it was improper to take, acquire or download these trade secrets, to not maintain their secrecy or to use them for any purpose other than the benefit of CentiMark.

99.    Osborne also knew or should have known that his taking, acquiring or downloading these trade secrets was in violation of his Employment Agreement.

100.    BluSky knew or should have known that these trade secrets of CentiMark were improperly acquired by Osborne.

101.    Upon information and belief, Osborne and BluSky are still in possession of and/or have used, disclosed and/or relied upon CentiMark's trade secrets for their benefit.

102.    Osborne and BluSky's conduct is knowing, intentional, malicious, in bad faith, and has caused and will continue to cause immediate and irreparable harm to CentiMark, and for CentiMark to suffer compensatory damages.

103.    Pursuant to Section 1836 of the Defendant Trade Secrets Act, CentiMark is entitled to injunctive relief, compensatory damages, exemplary damages, reasonable attorneys' fees and any other appropriate relief.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne and BluSky for compensatory damages, exemplary damages, attorneys' fees, costs and all other appropriate relief, including injunctive relief.

<u>**COUNT II**</u>
**CentiMark v. Osborne and BluSky**
**Violation of the Pennsylvania Uniform Trade Secrets Act**

104.    CentiMark incorporates by reference Paragraphs 1-103 above as if fully set forth herein.

105.    Osborne and BluSky are "persons" as defined by the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Conn. Stat. § 5301 *et seq.*

106.    Osborne will inevitably disclose or continue to disclose and use CentiMark's trade secrets to compete directly with CentiMark on behalf of BluSky, as his duties and responsibilities with BluSky are substantially similar to what his duties and responsibilities were with CentiMark.

107.    Pursuant to Sections 5303-5305 of the PUTSA, CentiMark is entitled to injunctive relief, compensatory damages, monetary damages, exemplary damages, reasonable attorneys' fees and any other appropriate relief.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne and BluSky for compensatory damages, monetary damages, exemplary damages, attorneys' fees, costs and all other appropriate relief, including injunctive relief.

<u>**COUNT III**</u>
**CentiMark v. Osborne**
**Violation of the Computer Fraud and Abuse Act**

108.    CentiMark incorporates by reference Paragraphs 1-107 above as if fully set forth herein.

109.    CentiMark issued Osborne a protected laptop computer and cell phone so that he could perform his work duties and responsibilities, including providing products and services in interstate commerce and interstate communication with other CentiMark employees, customers and vendors.

110.    At all times during his employment and after his resignation, Osborne knew he was only authorized to use his protected, CentiMark-issued laptop and cell phone to access CentiMark's Confidential Information and trade secrets for the benefit of CentiMark.

111.    Osborne was not authorized to access and/or exceeded his authorization when he accessed his protected CentiMark-issued laptop and cell phone to obtain CentiMark's Confidential Information for his and/or BluSky's benefit.  Moreover, Osborne's access of his protected CentiMark-issued laptop and cell phone to obtain CentiMark's Confidential Information for his and/or BluSky's benefit violated Section 4.01(b) his Employment Agreement.

112.    Osborne's improper access of his protected, CentiMark-issued laptop and cell phone has caused loss to CentiMark of at least $5,000.00 in value.

113.    In addition to the value of CentiMark's Confidential Information that was misappropriated, CentiMark has been forced to hire a computer forensic firm to determine the extent of Osborne's malfeasance.

114.    Pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, CentiMark is entitled to compensatory damages and all other appropriate relief.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne for compensatory damages and all other appropriate relief.

## COUNT IV
### CentiMark v. Osborne
### Breach of Duty of Loyalty

115.    CentiMark incorporates by reference Paragraphs 1-114 above as if fully set forth herein.

116.    As an employee of CentiMark, Osborne owed a common law duty of loyalty to CentiMark.

117.    By virtue of Osborne's knowledge of CentiMark's Confidential Information, including trade secrets, and his use of it to assist him in violating his Employment Agreement and to otherwise compete against CentiMark on behalf of BluSky for his own personal gain, Osborne breached such duty.

118.    Contrary to his common law duty of loyalty, Osborne acted in his self-interest and engaged in self-dealing to further his new employment with BluSky.

119.    As a result of Osborne's breach of his common law duty of loyalty, CentiMark has suffered and will continue to suffer immediate and irreparable harm for which it has no adequate remedy at law.

120.    Osborne's breach of his common law duty of loyalty has caused and will continue to cause CentiMark to suffer monetary damages and legal costs.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne for monetary damages and punitive damages, and all other appropriate relief, including injunctive relief.

<u>COUNT V</u>
**CentiMark v. Osborne**
**Breach of Contract**

121.    CentiMark incorporates by reference Paragraphs 1-120 above as if fully set forth herein.

122.    Osborne is party to a valid and enforceable written contract with CentiMark, *i.e.,* his Employment Agreement (Exhibit A), which is supported by valid consideration.

123.    CentiMark has performed all of its obligations under Osborne's Employment Agreement, including all conditions precedent to enforcement of the Employment Agreement.

124.    Section 4.01(a) of Osborne's Employment Agreement provides that he shall not misappropriate, disclose or use, or make available to any person or any entity for use outside of CentiMark any of CentiMark's Confidential Information.

125.    Section 4.01(a) also provides that Osborne shall not use such information to his own advantage and/or to the advantage of others, except as required in performance of his duties for CentiMark.

126.    Osborne has breached Section 4.01(a) of his Employment Agreement with CentiMark by misappropriating and disclosing CentiMark's Confidential Information.

127.    Section 4.04 of Osborne's Employment Agreement provides that he shall not engage, directly or indirectly, in any Competing Business in a Restricted Area for two years from the date his employment with CentiMark terminates.

128.    Osborne has breached Section 4.04 of his Employment Agreement with CentiMark by directly competing against CentiMark in the same geographic area where he worked as a CentiMark employee within two years of his employment with CentiMark.

129.     Section 4.07 of Osborne's Employment Agreement provides that he shall notify CentiMark of any subsequent employment he enters into in the two years after his employment with CentiMark terminates.

130.     Osborne has breached Section 4.07 of his Employment Agreement with CentiMark by failing to notify CentiMark of his subsequent employment with BluSky.

131.     Osborne's breaches of his Employment Agreement with CentiMark have endangered CentiMark and exposed CentiMark to immediate and irreparable harm for which there is no adequate remedy at law.

132.     Osborne's breaches of his Agreement with CentiMark also have caused and will continue to cause CentiMark to suffer monetary damages and legal costs.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne for injunctive relief and pursuant to Osborne's Employment Agreement, reasonable attorneys' fees, and all costs incurred, and all other appropriate relief.

### COUNT VI
### CentiMark v. Hammett and Calvin
### Breach of Contract

133.     CentiMark incorporates by reference Paragraphs 1-132 above as if fully set forth in this paragraph.

134.     Hammett and Calvin are parties to valid and enforceable written contracts with CentiMark, *i.e.,* their Employment Agreements (Exhibits B and C, respectively), which are supported by valid consideration.

135.     CentiMark has performed all of its obligations under these Employment Agreements, including all conditions precedent to their enforcement.

136.     Section 4.06 of Hammett's and Calvin's Employment Agreements provide that each of them shall not directly or indirectly solicit or induce, or try to solicit or induce any

employee of CentiMark to leave CentiMark for any reason whatsoever or hire or assist in the hiring of any employee of CentiMark within two years after their employment with CentiMark terminates.

137.     Hammett and Calvin have breached Section 4.06 of their Employment Agreements with CentiMark by soliciting and trying to induce Osborne to leave his CentiMark employment for BluSky.

138.     Hammett and Calvin's breaches of their Employment Agreements with CentiMark have endangered CentiMark and exposed CentiMark to immediate and irreparable harm for which there is no adequate remedy at law.

139.     Hammett and Calvin's breaches of their Agreements with CentiMark have also caused and will continue to cause CentiMark to suffer monetary damages and legal costs.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Hammett and Calvin for compensatory damages, and pursuant to Hammett and Calvin's Employment Agreements, reasonable attorneys' fees, and all costs incurred, and all other appropriate relief, including injunctive relief.

### COUNT VII
### CentiMark v. BluSky, Hammett and Calvin
### Tortious Interference with Contractual Relationship

140.     CentiMark incorporates by reference Paragraphs 1-139 above as if fully set forth in this paragraph.

141.     BluSky, by hiring Osborne, and upon information and belief with knowledge of Osborne's obligations to CentiMark, has interfered with and induced Osborne to breach the terms of his Employment Agreement with CentiMark.

142.    Hammett and Calvin, by engaging in the conduct described above, and upon information and belief, with knowledge of Osborne's obligations to CentiMark, have interfered with and induced Osborne to breach the terms of his Employment Agreement with CentiMark.

143.    BluSky, Hammett and Calvin's conduct in interfering with these existing contractual relations was and is willful, intentional and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to CentiMark.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against BluSky, Hammett and Calvin for compensatory damages, punitive damages and all other appropriate relief, including injunctive relief.

**COUNT VIII**
**CentiMark v. All Defendants**
**Unfair Competition**

144.    CentiMark incorporates by reference Paragraphs 1-143 above as if fully set forth in this paragraph.

145.    Defendants, by engaging in the conduct described above, including misappropriating, disclosing and misusing CentiMark's Confidential Information, including trade secrets; obtaining CentiMark's Confidential Information, including trade secrets, from Osborne's protected laptop for Osborne and/or BluSky's benefit; breaching common law and contractual duties; and interfering by improper means with CentiMark's employees, which acts are inextricably intertwined, have engaged in unfair competition with CentiMark.

146.    Defendants' conduct was and is willful, intentional and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to CentiMark.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne, Hammett, Calvin and BluSky for monetary damages, compensatory damages, punitive damages and all other appropriate relief, including injunctive relief.

### COUNT IX
### CentiMark v. All Defendants
### Civil Conspiracy

147.    CentiMark incorporates by reference Paragraphs 1-146 above as if those fully set forth in this paragraph.

148.    Defendants, by engaging in the conduct described above, have agreed and conspired to commit unlawful acts against CentiMark and/or engage in competition with CentiMark by unlawful means with an intent to injure CentiMark and will continue to take acts in furtherance of such conspiracy.

149.    Defendants' conduct was and is willful, intentional and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to CentiMark.

WHEREFORE, CentiMark respectfully requests judgment in its favor and against Osborne, Hammett, Calvin and BluSky, and an award of monetary damages, compensatory damages and punitive damages, and all other appropriate relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff CentiMark Corporation, respectfully requests that:

(a)    Defendants Osborne and BluSky, whether acting alone or in concert, be enjoined from using, disclosing or retaining any of the trade secrets and confidential/proprietary information of CentiMark, including but not limited to: technical information such as installation methods, compositions, and product developments and improvements; business information such as customer sales and job information, job cost, pricing and profit margin information,

customer warranty information, sales proposals, leads, methods and approaches, lists of customers and prospective customers, and information concerning their facilities, roofing requirements and needs, identity of and information about key contact personnel of customers and prospective customers, service reports, supply sources, and marketing, production and merchandising systems or plans; and sales-related systems applications such as its auto-quote and auto-proposal systems;

(b)      Defendants Osborne and BluSky, and anyone acting in concert with them or any of them, including any agent, employee, officer or representative of Defendant BluSky, be ordered to return to CentiMark any and all property of CentiMark in possession of Defendants Osborne and  BluSky, including any confidential/proprietary information and trade secrets of CentiMark, whether in original, copied, computerized, handwritten or any other reproduced form;

(c)      Hammett and Calvin, and all other persons or entities acting in concert with them or on their behalf, be enjoined from soliciting or recruiting employees of CentiMark for a period of two years or for a period equal to the length of their breaches of their Employment Agreements, whichever is longer, which period shall run from the date of the Court's Order;

(d)       BluSky, Hammett and Calvin be enjoined from further interfering with the restrictive covenant agreements between CentiMark and its past and current employees;

(e)      An accounting be made of all corporate opportunities of CentiMark usurped and diverted by Defendant BluSky by way of its misappropriation of CentiMark's Confidential Information and of all sales and profits of Defendant BluSky from May 1, 2018 to the present;

(f)     It be awarded exemplary and compensatory damages, including business costs and resulting business losses be awarded against Defendants Osborne and BluSky, jointly and severally, in favor of CentiMark in an amount to be determined based on evidence presented at trial;

(g)     It be awarded Defendant BluSky's profits, both past and future, gained as a result of jobs acquired by unfair use of CentiMark's Confidential Information and unfair competition by Defendants;

(h)     It be awarded reasonable attorneys' fees, costs and expenses it has incurred related to Defendants Osborne, Hammett and Calvin's breaches of their Employment Agreements, as agreed to by Osborne, Hammett and Calvin in their Employment Agreements;

(i)     It be awarded reasonable attorneys' fees, costs and expenses incurred pursuing its claim under the Defend Trade Secrets Act;

(j)     It be awarded reasonable attorneys' fees, costs and expenses incurred pursuing its claim under the Pennsylvania Uniform Trade Secrets Act;

(k)     It be awarded reasonable attorneys' fees, costs and expenses incurred pursuing its claims related to breaches of the Individual Defendants' Employment Agreements;

(l)     It be awarded punitive damages in an amount to be determined based on the evidence presented at trial; and

(m)     It be awarded any and all other legal or equitable relief which the Court deems appropriate.

Respectfully submitted,



*/s/ Christian A. Angotti*
Robert W. Cameron, (PA #69059)
bcameron@littler.com
Terrence H. Murphy, (PA #36356)
tmurphy@littler.com
Allison R. Brown, (PA #309669)
abrown@littler.com
Christian A. Angotti, (PA #322881)
cangotti@littler.com
**LITTLER MENDELSON, P.C.**
625 Liberty Avenue
26th Floor
Pittsburgh, PA  15222
412.201.7635/7678/7623
412.456.2377 fax

Dated:  August 16, 2018                    Attorneys for Plaintiff
CentiMark Corporation

## **VERIFICATION**

I, Daniel Kimball, verify that I am the Southern Group Vice President of Sales for CentiMark Corporation, that I am authorized to make this Verification on behalf of CentiMark Corporation, and that the statements of fact contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that this Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Dated: August 16, 2018

Daniel Kimball

Firmwide:156205480.5 057617.1015

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 16th day of August, 2018 a true and correct copy of the foregoing

Complaint was served via U.S. First Class Mail, postage prepaid upon the following:

Troy Osborne
1011 Belvedere Drive
Asheville, AL 35953

Kent Stemper
Chief Executive Officer
BluSky Restoration Contractors, LLC
BluSky Corporate Headquarters
9767 East Easter Avenue
Centennial, CO 80112

Phillip Hammett
3206 Craft road
Olive Branch, MI 38654

Michael Calvin
1342 Island Place, E.
Memphis, TN 38103

By:   _/s/ Christian A. Angotti_

Firmwide:156205480.5 057617.1015